UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ELTON LONE EAGLE, SR.,<br>and ZACHARY BROWN THUNDER,<br><br>Defendants. | 3:15-CR-30050-01-02-RAL<br><br><br>**AMENDED** OPINION AND ORDER<br>DENYING MOTION TO DISMISS<br>INDICTMENT |

## I. Factual Background

A grand jury issued an amended indictment charging Elton Lone Eagle Sr. and Zachary Brown Thunder (collectively "Defendants") with two counts of assault with a dangerous weapon and two counts of assault resulting in serious bodily injury. Counts I and III of the amended indictment alleged that Defendants assaulted A.H., while Counts II and IV alleged that Defendants assaulted Miles Condon. The amended indictment alleged that the assaults occurred on January 29, 2015, near Dupree, South Dakota. The government contended that Lone Eagle held down A.H. while Brown Thunder used the flat side of a heated-up knife to brand a gang symbol on A.H.'s arm and that Condon was similarly assaulted. The Defendants denied having done so.

The joint trial against the Defendants commenced on October 20, 2015. Doc. 99. A.H. and Condon both testified on the second day of trial. Doc. 111 at 104–173; 174–193. A.H., who took the stand first, testified that on January 29, 2015, he, Lone Eagle, Brown Thunder, and

1

Condon were in an upstairs room at a house in Dupree, South Dakota.  Doc. 111 at 117–121.

According to A.H., Lone Eagle, Brown Thunder, and Condon were drinking vodka; at some

point they left A.H. and went downstairs.  Doc. 111 at 121–22.  Shortly thereafter, A.H. heard

someone yell out in apparent pain.  Doc. 111 at 122.  In A.H.'s account, Lone Eagle then

returned to the room and told him that they were leaving; however, when A.H. got downstairs,

Lone Eagle shoved him to the ground and held him down while Brown Thunder branded two

letters on the upper arm of A.H. with a hot butter knife.  Doc. 111 at 123–28.

Condon testified on direct examination that he was too intoxicated on January 29, 2015,

to remember the events of that day, including how he got a similar burn mark on his arm and

who put it there.  Doc. 111 at 175–79.  Lone Eagle's attorney Edward Albright cross-examined

Condon about his lack of memory and his statements to an investigator that he had burned and

cut himself in the past.  Doc. 111 at 179–188.  Albright also elicited testimony from Condon that

Condon's brother, Clinton Buckman, was at the house on January 29, 2015.  Doc. 111 at 185.

David Siebrasse, Brown Thunder's attorney, cross-examined Condon next.  Doc. 111 at

188–191.  Siebrasse asked Condon a few questions about his family and living arrangements

before engaging in the following exchange:

> Siebrasse: Zach Brown Thunder is not there at all during that day, is he?
> Condon: (Pause.) I seen him at the door.  That's all I can remember.
> Siebrasse: All you remember is seeing him at the door?
> Condon: Yeah.  Yeah, just when he came in like --
> Siebrasse: But your parents live in a house that's red on the outside, correct?
> Condon: Yes.
> Siebrasse: And do you know what time it was that all of this stuff went down?
> Condon: No, I do not.
> Siebrasse: Because you are too drunk to remember accurately?
> Condon: Yes.

2

> Siebrasse: You testified earlier that you remember a white boy[1] being there, that he came with Elton. Zach wasn't there, was he, with Elton and the white boy?
> Condon: I can't remember. I mean, like, I think. I don't know.

Doc. 111 at 190. Siebrasse then surprised everyone (except perhaps himself and his client) in the

courtroom by continuing:

> Siebrasse: You've done some day labor for a David Pesicka or Pesicka recently, haven't you?
> Condon: Pesicka, yes.
> Siebrasse: Pesicka, okay. Isn't it true within the last few days that you had a conversation with David Pesicka and admitted to him that Zach Brown Thunder did not have anything to do with the branding of you or [A.H.]? Did you admit that to him?
> Condon: Yeah.
> Siebrasse: Did you also admit to David Pesicka that it was your brother Clinton that did it?
> Condon: Yeah, it was.
> Siebrasse: No further questions, Your Honor.

Doc. 111 at 190–91.

The redirect examination by the government's attorney Jay Miller went as follows:

> Miller: Miles, do you remember getting burnt at all that day?
> Condon: No, I don't.
> Miller: Could you tell us who burnt you?
> Condon: My brother.
> Miller: If you don't remember getting burnt, how can you tell us who burnt you?
> Condon: He admitted to it.
> Miller: He told you this?
> Condon: Yes.
> Miller: And have you ever told anybody that before?
> Condon: No.
> Miller: So the only thing you know is from what he told you?
> Condon: Yes.
> Miller: Do you remember consenting to being burned?
> Condon: No.
> Miller: Do you remember fighting when you got burned?
> Condon: No.
> Miller: You don't remember being burnt at all?

---

[1] A.H. is a white male.

> Condon: No.  No, I don't.
> Miller: Nothing further.

Doc. 111 at 191–92.

The government then moved for a mistrial, arguing that Siebrasse had violated Federal Rule of Criminal Procedure 16[2] by failing to disclose the statement Condon made to Pesicka. Doc. 111 at 196.  The government also argued that a mistrial was justified because Siebrasse had introduced inadmissible hearsay evidence which would be impossible for the jury to ignore. Doc. 111 at 197–98.   The government maintained that admission of the hearsay evidence prejudiced its case beyond repair.  Doc. 111 at 197–98.  This Court reserved ruling on the government's motion so that it could think about the issue over the noon recess.  Doc. 111 at 198.

The parties went back on the record approximately one hour later.  Tellingly, Lone Eagle, who had moved for a mistrial right before Condon testified, opposed the government's motion for a mistrial.  Doc. 111 at 199.  When given an opportunity to explain the change of heart, Lone Eagle's attorney declined to do so.  Doc. 111 at 205–06.  After hearing additional argument from Siebrasse[3] and the government, this Court granted the government's motion for a mistrial.  Doc. 111 at 200–08.

As this Court explained, Buckman's claimed out-of-court statement that he had burned Condon and A.H. was inadmissible hearsay.  Doc. 111 at 200–07.  Buckman is the declarant, did not make the statement under oath, and was not available to testify and be subject to cross-

---

[2]There were multiple discovery requests from the Defendants to the government and vice versa. Docs. 8, 18, 19, 20, 22, 23.  This Court also incorporated the requirements of Rule 16 in its scheduling order.  Doc. 28.

[3]One of Siebrasse's arguments to justify non-disclosure under Rule 16 to the government was that he only recently had learned of the statement.  Doc. 111 at 196.  However, Rule 16(c) imposes a continuing duty to "promptly" disclose such newly discovered evidence "before or during trial."

examination. Buckman purportedly made the statement to Condon who then repeated what he recalls to have heard from Buckman. It was Buckman's inadmissible hearsay, rather than Condon's own firsthand knowledge, which was the basis for Condon's statement to Pesicka that Buckman was responsible for the brandings. Doc. 111 at 190–92. The statement that Condon made to Pesicka was entirely based on Buckman's hearsay statement and thus is inadmissible if offered to prove that Buckman had committed the brandings.

Siebrasse asserted, and Lone Eagle now argues, that Siebrasse was impeaching Condon and not introducing a hearsay statement. Condon however was consistent throughout that he was too drunk to have any memory at all of how he was burned on his arm. Impeachment must be a witness's prior statement inconsistent with his testimony, and there was no statement here of Condon that Condon recalls who branded him. See United States v. McCrady, 774 F.2d 868, 873 (8th Cir. 1985) (explaining that a prior out-of-court statement must be inconsistent with the witness's testimony to be admissible as impeachment evidence). That Buckman ostensibly told Condon that he did it is not impeachment of Condon, but the introduction of a highly impactful hearsay statement to exculpate the Defendants.

The inadmissible hearsay concerning Buckman's statement to Condon was extremely prejudicial to the government's case; it directly suggested that someone other than the Defendants burned not only Condon but also A.H. Doc. 111 at 199, 206–07. Lone Eagle's sudden choice to no longer seek a mistrial demonstrates how impactful the hearsay statement was. Further, because Siebrasse failed to disclose Buckman's statement to the government, the government was not prepared to object to admission of the hearsay evidence or speak with Condon about it before calling him as a witness. Doc. 111 at 201. Although this Court considered alternatives to granting a mistrial, such as instructing the jury to disregard the

inadmissible hearsay, it ultimately concluded that there were no alternatives that could effectively ameliorate the prejudice to the government's case. Doc. 111 at 206–208.  Given all of these circumstances, this Court concluded that there was manifest necessity for a mistrial. Doc. 111 at 200–09.

Both Defendants then moved for dismissal of the charges against them on the ground that retrying them after the jury was sworn would violate the Double Jeopardy Clause of the Fifth Amendment.  Doc. 111 at 208–09; see United States v. Givens, 88 F.3d 608, 611 (8th Cir. 1996) ("Retrying a defendant after a mistrial implicates double jeopardy because jeopardy attaches when the first jury is sworn.").  This Court denied the motions because there was manifest necessity for the mistrial.  Doc. 111 at 208–09; see Arizona v. Washington, 434 U.S. 497, 505 (1978) (explaining that when a judge grants a mistrial over the defendant's objection, the Double Jeopardy Clause permits a second prosecution if there was manifest necessity for the mistrial). Lone Eagle has now filed a second motion to dismiss the charges against him, arguing again that a retrial would violate the Double Jeopardy Clause.  Doc. 113.  Some of the arguments he offers in support of his motion are the same as his arguments at trial while others are new.

## II.  Analysis of Double Jeopardy Arguments

The Fifth Amendment's Double Jeopardy Clause protects a criminal defendant against multiple prosecutions for the same offense.  Oregon v. Kennedy, 456 U.S. 667, 671 (1982). Because jeopardy attaches when the jury is empaneled and sworn, Crist v. Bretz, 437 U.S. 28, 35–36 (1978), the protections provided by the Double Jeopardy Clause include "the defendant's valued right to have his trial completed by a particular tribunal," Washington, 434 U.S. at 503 (citation and internal quotation marks omitted).  This right, however, "must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments."  Wade v.

Hunter, 336 U.S. 684, 689 (1949).   When, as here, a judge declares a mistrial over the defendant's objection, the Double Jeopardy Clause permits a second prosecution if the mistrial was the result of "manifest necessity."   Washington, 434 U.S. at 505.   The term "necessity" should not be interpreted literally; rather, the Supreme Court has "assume[d] that there are degrees of necessity," and "require[s] a 'high degree' before concluding that a mistrial is appropriate."   Id. at 506.   "Because of the wide variety of circumstances that may require early termination of a criminal trial, the trial judge is afforded 'broad discretion' in deciding whether such necessity is present in a particular case."   Moussa Gouleed v. Wengler, 589 F.3d 976, 981 (8th Cir. 2009) (quoting Illinois v. Somerville, 410 U.S. 458, 462 (1973)).

Lone Eagle makes several arguments in support of his contention that there was no manifest necessity for a mistrial, but none of them are persuasive.   Lone Eagle argues first that there was no manifest necessity because the government not only failed to object to Siebrasse's questions to Condon, but also elicited Condon's testimony that Buckman told him he was responsible for the branding.   As this Court explained during the trial, however, Buckman's admission and Condon's statements to Pesicka were a complete surprise to the government; without knowing anything about these statements, the government could hardly be expected to make a proper objection to Siebrasse's questions.   Doc. 111 at 201.   The manner in which Siebrasse framed his questions did not reveal that the statement was hearsay from Buckman and instead implied an admission by Condon.   See Doc. 111 at 190–91.   The government had little choice but to try to mitigate the effect of Siebrasse's cross-examination by asking Condon, who had maintained all along that he did not remember the alleged assault, how he might be able to identify who burned him.   The government's questioning revealed that Condon's statement to Pesicka was based entirely on what he had heard Buckman say and that Siebrasse was not truly

7

engaged in impeachment at all.  Contrary to Lone Eagle's assertion, this was not a situation where the government opened the door and invited error.

Second, Lone Eagle argues that there was no manifest necessity for a mistrial because "Brown Thunder's questions to Condon appear to be an attempt to impeach him by a prior inconsistent statement, that is, to impeach his testimony that he did not remember what happened on the night of the alleged branding by introducing his statements to David Pesicka that he in fact knew that his brother Clinton had done it." Doc. 114 at 6.  If that is what Siebrasse had been doing, the approach would have been different.  Siebrasse did not introduce the topic to explore what Condon in fact recalled of the night in question and had reported as his recollection to Pesicka, but introduced the hearsay-based statement and ended his cross-examination.  Doc. 111 at 191–92.  Condon's statements to Pesicka were based on what Buckman told him rather than what Condon himself remembered.  Doc. 111 at 191–92.  Condon's telling Pesicka what he heard from Buckman is not an inconsistent statement that could be used to impeach him. McCrady, 744 F.2d at 873.

Lone Eagle argues third that before this Court granted a mistrial, Brown Thunder "should have been given an opportunity" to demonstrate that Buckman's out of court statement was admissible under Federal Rule of Evidence 804(b)(3).  "For a statement to qualify under the Rule 804(b)(3) hearsay exception, the declarant must be unavailable, the statement must so far tend to subject the declarant to criminal liability that a reasonable person would not have made the statement unless he or she believed it to be true, and corroborating circumstances must clearly indicate the trustworthiness of the statement." United States v. Halk, 634 F.3d 482, 489 (8th Cir. 2011).  Although both Defendants were given an opportunity to argue concerning the mistrial motion, neither Defendant even mentioned Rule 804(b)(3) at trial, let alone argued that

8

Buckman's statement was admissible under this exception.  Nor did the Defendants offer any evidence suggesting that Buckman's statement was trustworthy.  Buckman appeared to be unavailable at the time of trial, but it was unclear what effort had been made to locate him and the lack of disclosure of the statement left the government blindsided about how important it might be to have Buckman available.  As the record stood at the time of the government's motion for a mistrial, Buckman's statement was not admissible under Rule 804(b)(3).  Lone Eagle's argument essentially is that this Court should have given Brown Thunder an opportunity to demonstrate the admissibility of Buckman's statement under a theory which neither Defendant raised and for which there was insufficient support in the record.  Lone Eagle's Rule 804(b)(3) argument is unpersuasive.

Fourth, Lone Eagle argues that because he was not responsible for eliciting the inadmissible hearsay, a mistrial should not have been granted with respect to him.  Lone Eagle cites two cases—Givens, 88 F.3d 608 and United States v. Allen, 984 F.2d 940 (8th Cir. 1993)— where the Eighth Circuit found a lack of manifest necessity with respect to certain defendants in joint trials.  But the holdings in Givens and Allen did not turn upon which defendant was responsible for the event that caused the mistrial.  Rather, the Eighth Circuit's decisions in these two cases were based on how the events that caused the mistrial affected each defendant.  In Givens, for instance, the district court granted a mistrial after one of the defense attorneys in a multi-defendant case became a witness during the middle of trial.  88 F.3d at 610.  Although the Eighth Circuit affirmed the grant of the mistrial with respect to the defendant whose attorney became a witness and could therefore no longer represent him, it found no manifest necessity justifying a mistrial for the other defendants.  Id. at 612–13.  In Allen, the district court granted a mistrial in a three-defendant case after discovering that the government had failed to produce

exculpatory evidence concerning two of the defendants. 984 F.2d at 941–42. Although the third

defendant objected, the district court found manifest necessity for the mistrial based on concerns

of judicial economy and the court's belief that a joint trial would benefit the third defendant. Id.

at 942. The Eighth Circuit reversed, concluding that there was no manifest necessity because no

reversible error had occurred with respect to the third defendant and because it was unclear

whether the defendant would have actually benefited from a joint trial. Id. at 943. Here, the

inadmissible hearsay statement implicating Buckman as the one who branded Condon and A.H.

prejudiced the government's case against both Defendants. Lone Eagle did not elicit the

inadmissible hearsay, but he would have gained an unfair advantage from it.

Fifth, Lone Eagle argues that there was no manifest necessity because the government

requested a mistrial so that it could strengthen its case. See Washington, 434 U.S. at 507–508

(strongly disapproving of mistrials granted to allow the prosecution to buttress weaknesses in its

case). This argument mischaracterizes the reasons the government sought a mistrial and ignores

the basis for this Court's ruling. True, the government when arguing for a mistrial said that

Buckman's statement needed to be investigated to ensure that an innocent person was not

convicted of the alleged assaults, and this Court acknowledged that the government's concern

was legitimate.[4] Doc. 111 at 204, 207. But expressing concern about possibly convicting an

innocent person is a far cry from requesting a mistrial to ensure that a defendant is convicted.

Further, the principal basis for the government's mistrial request was the unfair prejudice caused

---

[4]There is a certain irony in Lone Eagle's use of these statements in his argument. Part of the Court's concern in granting a mistrial was exposing Lone Eagle and Brown Thunder to possible conviction if the jury somehow could have performed the mental gymnastics to abide by an instruction to disregard all testimony about the Buckman hearsay statement. There would be potential manifest injustice if Buckman in fact was the culprit. Rather, the Court wanted to allow all parties to explore whether Buckman in fact had confessed to branding Condon and A.H. or if Buckman had even been present at the time A.H. and Condon sustained burns.

by the inadmissible hearsay.  And it was this unfair prejudice, rather than a desire to allow the government to buttress its case, that caused this Court to grant a mistrial.

Finally, Lone Eagle argues that a limiting instruction would have eliminated any need for a mistrial.  For the reasons this Court explained during the trial, a limiting instruction would not have been sufficient to alleviate the prejudice to the government caused by the inadmissible hearsay.  See Donnelly v. DeChristoforo, 416 U.S. 637, 644 (1974) (recognizing that "some occurrences at trial may be too clearly prejudicial for . . . a curative instruction to mitigate their effect").

In sum, the inadmissible hearsay was extremely prejudicial to the government's case against both defendants and there was no viable alternative to a mistrial.  There were multiple possibilities unexplored because of the hearsay statement and lack of disclosure, including:  1) Buckman burned A.H. and Condon and would admit doing so, in which case **the case should be dismissed against these Defendants;** 2) Buckman made the statement, but **did not burn A.H. and Condon and** has some explanation for it such as protecting the Defendants; 3) Condon misheard what Buckman said; 4) Buckman, contrary to Condon's testimony, did not make any such statement to Condon; 5) Buckman was not present and perhaps has some alibi for being elsewhere at the time A.H. and Condon sustained the burns; or 6) some other combination of these possibilities.  Not knowing about the statement until it was sprung in mid-trial by Siebrasse left the government unable to properly explore and address these possibilities.  There was a manifest necessity for a mistrial.  Given these circumstances, Lone Eagle's rights under the Double Jeopardy Clause must "be subordinated to the public's interest in fair trials designed to end in just judgments." Wade, 336 U.S. at 689.

11

## III. Conclusion

For the reasons stated above, it is hereby

ORDERED that Lone Eagle's Motion to Dismiss Indictment, Doc. 113, is denied.

DATED this 14th day of December, 2015.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE